## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 11 2019, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office and
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ismael Campos-Martinez,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 11, 2019

Court of Appeals Case No.
18A-CR-1724

Appeal from the Cass Superior
Court

The Honorable James
Muehlhausen, Judge

Trial Court Cause No.
09D01-1801-F6-40

**Robb, Judge.**

# Case Summary and Issue

[1] Following a jury trial, Ismael Campos-Martinez was convicted of domestic battery, a Level 6 felony, and was sentenced to two years incarceration. Campos-Martinez appeals his conviction, raising one issue for our review: whether the trial court abused its discretion in admitting hearsay testimony as an excited utterance. Concluding the trial court did not err in admitting the testimony and even if it did, the error was harmless, we affirm.

# Facts and Procedural History

[2] Campos-Martinez and Natasha Campos were in a relationship for ten years and married for the last year of that time. When they got together, Natasha had three children from a previous relationship, and Campos-Martinez and Natasha then had two children together. Late in 2017, their marriage hit a rough patch, and Campos-Martinez moved out of the Logansport home he shared with Natasha and the five children and into the home of Allison Rosas, a woman with whom he was having an affair.

[3] On the morning of January 21, 2018, Campos-Martinez came to the family home to spend time with the children. During his visit, Allison called several times, which upset Natasha, who was still holding out hope for a reconciliation. At some point, Campos-Martinez took the four youngest children with him to the laundromat to wash some clothes. Natasha called Campos-Martinez several times to no avail. Suspicious that Campos-Martinez was meeting

Allison there, Natasha walked to the closest laundromat and found Campos-Martinez video chatting with Allison while the kids played games. They argued for several minutes at the laundromat; Campos-Martinez was mad that Natasha had followed him to the laundromat and Natasha was mad that Campos-Martinez was on the phone with Allison instead of spending time with the kids. Campos-Martinez was unable to answer Allison's repeated calls because Natasha was following him around the laundromat and refusing to leave, and he told Natasha to "go back home and wait[.]" Transcript, Volume II at 44. Natasha went outside but did not leave until Campos-Martinez finished his laundry and the group returned to the house together. Shortly thereafter, Natasha found Campos-Martinez outside talking to Allison on the phone. Campos-Martinez then announced that he had to leave, even though it was early afternoon and he was supposed to be with the children until evening.

[4] Natasha and Campos-Martinez began fighting about Campos-Martinez "let[ting] another girl take time away from his kids[.]" *Id.* at 46. Campos-Martinez became angry and said he was leaving whether Natasha liked it or not. He said goodbye to the children and as he walked out the door onto the back porch, Natasha grabbed the back of his sweatshirt. When Campos-Martinez turned around, Natasha thought he was going to hit her, so she hit him first. Campos-Martinez "was really really p*ssed off at that time" and hit back, but Natasha ducked and the blow landed on her back, which caused her pain. *Id.* at 47. Campos-Martinez then grabbed Natasha's arms "so [she] couldn't hit him anymore." *Id.* At one point in this brief altercation, Natasha

yelled. A.M., her oldest son, heard her and came to the porch to try to break up the fight. As Campos-Martinez and Natasha continued to struggle with one another, A.M. was also hit, although Natasha did not know whether she or Campos-Martinez hit him. Campos-Martinez and Natasha then separated and everyone returned to the house. Natasha told Campos-Martinez to leave Allison or she would call the police. Ten to fifteen minutes after the altercation on the back porch, Natasha called 911.

[5] Officer Jarred Coffing, an Indiana conservation officer, was working the 3:30pm to midnight shift as a field training officer to probationary officer Jordan Wagner. They heard the 911 call come through as they passed through Logansport. Officer Coffing said they were less than 100 yards away from the address and responded within seconds. They were met at the door of the house by A.M. who "appeared to be extremely distressed, distraught, he's [sic] face was very red, swollen [and he was] crying[.]" *Id.* at 78. Officer Coffing noticed a "significant bruise on the one side of his face as well as a small cut and some blood." *Id.* A.M.'s injuries were "bright red like they just occurred." *Id.* at 105. A.M. told the officers that "his stepdad hit his mom." *Id.*

[6] When the officers entered the home, Natasha and Campos-Martinez were "yelling and bickering" but nothing physical was occurring. *Id.* at 89. Officer Coffing described Natasha as appearing "extremely distressed and distraught. She was very red in the face, crying, bloodshot eyes, upset. [S]he was noncommunicable for a couple minutes, she was so upset. [D]isheveled." *Id.*

at 81. The officers separated Campos-Martinez and Natasha and asked A.M. to go upstairs with his siblings.

[7] Officer Coffing stayed in the house and spoke to Campos-Martinez, who apologized and acknowledged that he and Natasha had gotten into a fight and that it had become physical. He also acknowledged that he had shoved Natasha and that when A.M. came out to help her, he also shoved A.M. While Officer Coffing was speaking to Campos-Martinez "[j]ust a handful of minutes" after his arrival at the house, A.M. came downstairs saying that he was mad at Campos-Martinez because "he had hit his mom." *Id.* at 85-86. Officer Wagner took Natasha outside and she told him Campos-Martinez had "grabbed her by the throat. She had attempted to punch him . . . or to hit him to get away from him at that time he hit her in the back." *Id.* at 111. Officer Wagner then placed Campos-Martinez under arrest and while he completed a domestic violence affidavit with Natasha, "she was still emotionally upset . . . crying the whole time." *Id.* at 113. The officers also called an ambulance to the house, but neither Natasha nor A.M. sought further medical treatment.

[8] The State charged Campos-Martinez with domestic battery and strangulation, both Level 6 felonies.[1] At the jury trial, Natasha related that Campos-Martinez had hit her but denied that he had put his hands around her throat or that her breathing was restricted. She admitted that she had asked the prosecutor's

---

[1] A second count of domestic battery, a Class A misdemeanor, was dismissed before trial.

office to drop the charges and that she was not testifying willingly. Campos-Martinez made hearsay objections during Officer Coffing's testimony about A.M.'s remarks and during Officer Wagner's testimony about Natasha's statement to him. The trial court overruled both objections on the basis of the excited utterance exception to the rule against hearsay. A.M. did not testify. At the conclusion of the evidence, the jury found Campos-Martinez guilty of domestic battery but not guilty of strangulation. The trial court sentenced Campos-Martinez to two years in the Cass County Jail for the conviction of domestic battery. Campos-Martinez now appeals his conviction.

# Discussion and Decision

## I. Standard of Review

[9] Campos-Martinez contends the trial court abused its discretion when it admitted Officer Coffing's and Officer Wagner's testimony as evidence over his hearsay objections. We review a trial court's evidentiary rulings for an abuse of discretion. *Snow v. State*, 77 N.E.3d 173, 176 (Ind. 2017). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances." *Id.*

[10] A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Ind. Evidence Rule 103(a). In determining whether an error in the introduction of evidence affected a defendant's substantial rights, we assess the probable impact of the evidence on the jury. *Thrash v. State*, 88 N.E.3d 198, 203 (Ind. Ct. App. 2017).

# II. Admission of Evidence

[11] Hearsay is a statement "not made by the declarant while testifying at the trial or hearing" that is "offered in evidence to prove the truth of the matter asserted" and is generally not admissible as evidence. Ind. Evidence Rule 801(c), 802. However, "[a] statement relating to a startling event or condition, made while the declarant is under the stress of excitement that it caused" is not excluded by the rule against hearsay. Evid. R. 803(2).

[12] To be an excited utterance, a "startling event or condition" must have occurred, the declarant must have made the statement while under the stress or excitement caused by that event or condition, and the statement must relate to the event or condition. *Young v. State*, 980 N.E.2d 412, 421 (Ind. Ct. App. 2012). Application of the excited utterance hearsay exception is not mechanical and the admissibility of statements offered pursuant to this exception must be shown to be trustworthy under the specific facts of the case. *Palacios v. State*, 926 N.E.2d 1026, 1031 (Ind. Ct. App. 2010). The focus is on whether the statement was made while the declarant was under the influence of the excitement caused by the startling event and is therefore inherently reliable because the declarant was incapable of thoughtful reflection and unlikely to manufacture falsehoods. *Boatner v. State*, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010). The amount of time that passed between the event and the statement is not dispositive; rather, the question is whether the declarant was still under the stress of excitement caused by the startling event when the statement was made. *Mathis v. State*, 859 N.E.2d 1275, 1279 (Ind. Ct. App. 2007).

[13] Campos-Martinez argues the trial court abused its discretion in allowing certain hearsay statements to be admitted into evidence as excited utterances because the altercation had occurred at least twenty minutes prior to the statements, both A.M. and Natasha had time for thoughtful reflection, and the statements were inherently unreliable because A.M. did not actually see the beginning of the altercation and Natasha had a motive to lie.

## A.  A.M.'s Statements

[14] The State elicited testimony from Officer Coffing that while he was speaking with Campos-Martinez, A.M. was making statements "[t]hat he was upset." Tr., Vol. II at 84.  Campos-Martinez objected on hearsay grounds.  Officer Coffing clarified under questioning from the State that "[i]t was a very short amount of time" between his arrival at the house and A.M. making those statements. *Id.* at 85.  Campos-Martinez then asked Officer Coffing several questions directed to how much time had passed between the altercation and his arrival.  Officer Coffing could not give a time frame for that.  The trial court overruled the objection, stating, "I don't think that much time has passed to take out the excited utterance exception of the hearsay rule. . . . I think it's pretty close to the point in time the event occurred[.]" *Id.* at 86.  Officer Coffing then testified that A.M. said he was mad "that [Campos-Martinez] had hit his mom." *Id.*  Officer Wagner later testified that when the officers first encountered A.M. and asked what had happened, A.M. responded that "his stepdad hit his mom." *Id.* at 105.  Campos-Martinez did not object to this testimony.

[15] We reiterate that lapse of time between an event and the statement is not dispositive, but a long period of time between the two reduces the likelihood that a statement is made while under the stress or excitement caused by the event. *Boatner*, 934 N.E.2d at 186. We also note that the State's questioning of the officers to establish how much time had elapsed between when the officers arrived and when the statements were made is, by itself, irrelevant. *See, e.g.,* Tr., Vol. II at 85 (State asking Officer Coffing, "Specifically, when [A.M.] was making statements to the defendant, how much time had passed between your arrival in the home and [A.M.] making those statements?"). The relevant question is how much time elapsed between the *event* and the statement. Nonetheless, other testimony established Natasha called 911 within ten or fifteen minutes of the altercation. *See* Tr., Vol. II at 52 (Natasha guessing it was ten or fifteen minutes after the incident when she called police). Therefore, the sum of the testimony presented at trial established the lapse of time as approximately twenty minutes. Twenty minutes is not per se too long a time for a statement to be considered an excited utterance. *See Noojin v. State*, 730 N.E.2d 672, 676-77 (Ind. 2000) (holding that trial court did not abuse its discretion in finding a statement made within twenty-five minutes of discovering two dead bodies was made under the stress of excitement caused by the event).

[16] In addition, Officer Coffing testified that when he first encountered A.M., he was distressed and distraught, his face was red and swollen, with a significant bruise and a small cut, and he was crying. Less than five minutes later, A.M.

made the statement to which Campos-Martinez objects. In determining whether a statement is an excited utterance, we have considered whether the declarant is crying, appears to be under stress, is injured, or is exhibiting other physical or psychological conditions that indicate stress. *See Fowler v. State*, 829 N.E.2d 459, 463-64 (Ind. 2005) (holding that statements made while the declarant was in pain, crying, bleeding, and having trouble catching her breath were properly admissible as excited utterances), *cert. denied*, 547 U.S. 1193 (2006). Given the short amount of time between the altercation and A.M.'s statements and given A.M.'s demeanor when officers arrived, the trial court did not abuse its discretion in admitting A.M.'s statements as excited utterances.[2]

[17] Campos-Martinez also cites *Noojin v. State* as support for his assertion that A.M.'s statements were inherently unreliable because he did not see Campos-Martinez hit Natasha. In *Noojin*, our supreme court noted that "it is assumed, although not specifically stated in the rule, that an excited utterance must be based on the declarant's personal knowledge." 730 N.E.2d at 677. "If a statement is instead based on conjecture, it is not admissible as an excited utterance to prove the truth of the matter reported." *Id.* In *Noojin*, the disputed testimony was that the declarant had been to an apartment where she saw the defendant with the two residents. She left the apartment for twenty to twenty-five minutes and when she returned, no one answered the door and she saw one

---

[2] And, as noted above, Officer Wagner later testified to the same content without objection.

of the residents lying on the floor through a window. The two residents were found murdered and an officer dispatched to the scene testified that within thirty-five minutes of his arrival, the declarant told him she had seen the defendant with the two victims and that the defendant killed them. Because the declarant's statement that the defendant had killed the victims was not based on her personal knowledge, the court held the trial court abused its discretion in admitting the statement as an excited utterance. *Id.*[3] Here, although it is unclear when A.M. joined the fray, it is apparent that he witnessed some of the tussle. Also, there was testimony from Natasha that Campos-Martinez had hit her and also from Officer Coffing that Campos-Martinez had admitted his role in the altercation. Any error in admitting Officer Coffing's testimony about A.M.'s statement was harmless because it was cumulative of other testimony, including basically the same statement being admitted during Officer Wagner's testimony without objection. *See Mathis*, 859 N.E.2d at 1280 (noting the admission of hearsay "is not grounds for reversal where it is merely cumulative of other evidence admitted").

## B. Natasha's Statements

[18] The State also elicited testimony from Officer Wagner that "maybe five" minutes passed between the time he arrived at the house and when he began speaking with Natasha. Tr., Vol. II at 109. The State then asked, "What did

---

[3] However, the court also held it was harmless error because it was clear that the statement was an assumption not an eyewitness account and therefore had little persuasive force. *Id.*

she tell you?" *Id.* Campos-Martinez again objected on hearsay grounds and asked Officer Wagner if he knew how long before he arrived at the house the incident had actually occurred. Officer Wagner did not. Nonetheless, the trial court overruled the objection, finding Natasha's statements to be an excited utterance and Officer Wagner was allowed to testify that Natasha told him she and Campos-Martinez had been arguing, that Campos-Martinez grabbed her by the throat and when she attempted to hit him to get away from him, he hit her in the back. As above, we note that the cumulative testimony established the statements were made approximately twenty minutes after the altercation and therefore were close enough in time to the startling event to be considered excited utterances. *See supra* ¶ 15. In addition, Natasha was distressed, crying, and her face was flushed when the officers arrived. *See Fowler*, 829 N.E.2d at 463-64.

[19] We acknowledge that whether Officer Wagner's testimony about Natasha's statement should have been allowed is a closer call because Natasha did use the ten to fifteen minutes before she called 911 to try to persuade Campos-Martinez to leave his girlfriend. This tends to imply Natasha was capable of thoughtful reflection before speaking with Officer Wagner in that she realized she had a bargaining chip and tried to use it. Nonetheless, Natasha had already testified Campos-Martinez hit her, Officer Coffing had already testified Campos-Martinez admitted his role in the incident, and Officer Wagner testified without objection that A.M. had said Campos-Martinez hit Natasha. *See Mathis*, 859 N.E.2d at 1280. The only part of Officer Wagner's testimony that was not

cumulative of other evidence was his testimony that Natasha said Campos-Martinez grabbed her by the throat. However, because the jury found Campos-Martinez not guilty of the strangulation charge, that testimony was not harmful to him even if it was admitted in error.

[20] Campos-Martinez acknowledges Natasha's in-court testimony that Campos-Martinez hit her but argues that without A.M.'s and Natasha's out-of-court statements, "there was no other substantial evidence supporting the battery conviction." Appellant's Br. at 13. We disagree. The uncorroborated testimony of the victim alone is sufficient to support a conviction. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). This argument is essentially a request that we reweigh the evidence supporting the conviction. The fraught relationship between Campos-Martinez and Natasha and Natasha's alleged "motive to lie" was squarely before they jury and it chose to believe Natasha. As an appellate court, we will not reweigh the evidence or judge witness credibility. *See Yoakum v. State*, 95 N.E.3d 169, 173 (Ind. Ct. App. 2018), *trans. denied*.

# Conclusion

[21] The trial court did not abuse its discretion in admitting testimony pursuant to the excited utterance exception to the rule against hearsay. Campos-Martinez's conviction for battery is therefore affirmed.

[22] Affirmed.

Riley, J., and Kirsch, J., concur.